Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSEPH HAUSER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ORGANON & CO., KEVIN ALI, and MATTHEW WALSH,<br><br>Defendants. | Case No. 2:25-cv-05322<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Joseph Hauser ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Organon & Co. ("Organon" or the "Company")

with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Organon's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Organon securities between October 31, 2024, to April 30, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Organon's prioritization of its capital allocation strategy through regular, quarterly dividends. Defendants' statements included, among other things, reassurance that capital allocation through the aforementioned dividends was a "#1 capital allocation priority" and that Organon was committed to consistent deployment of capital.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading

statements and/or concealing material adverse facts concerning the true state of the Company's priorities, particularly, related to capital allocation through quarterly dividends. Notably, Defendants concealed the high priority of Organon's debt reduction strategy following the Company's acquisition of Dermavant, resulting in a 70% decrease for the regular quarterly dividend. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Organon's securities at artificially inflated prices.

4.     Investors and analysts again reacted promptly to Organon's revelations. The price of Organon's common stock declined dramatically. From a closing market price of $12.93 per share on April 30, 2025, Organon's stock price fell to $9.45 per share on May 1, 2025, a decline of more than 27% in the span of just a single day.

## JURISDICTION AND VENUE

5.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

6.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Organon is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

9.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

10.    Plaintiff purchased Organon common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Organon is attached hereto.

11.    Organon & Co. is a Delaware corporation with its principal executive offices located at 30 Hudson Street, Floor 33, Jersey City, NJ 07302. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "OGN."

12.    Defendant Kevin Ali ("Ali") was, at all relevant times, a Director and Chief Executive Officer of Organon.

13.     Defendant Matthew Walsh ("Walsh") was, at all relevant times, an Executive Vice President and the Chief Financial Officer of Organon.

14.     Defendants Ali and Walsh are sometimes referred to herein as the "Individual Defendants." Organon together with the Individual Defendants are referred to herein as the "Defendants."

15.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Organon's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

16.     Organon is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Organon under respondeat superior and agency principles.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

*Company Background*

18.     Organon is a global healthcare company with a primary focus on improving the health of women throughout their lives. The Company develops and delivers health solutions through a portfolio of prescription therapies and medical devices within women's health, biosimilars and established brands. Organon operates six manufacturing facilities, which are located in Belgium, Brazil, Indonesia, Mexico, the Netherlands and the United Kingdom.

***The Defendants Materially Misled Investors Concerning***

***Organon's Declared Dividend***

*October 31, 2024*

19.     On October 31, 2024, Organon published a press release detailing the
Company's third quarter 2024 financial results. As part of the associated earnings
call, CEO Ali detailed the Company's recent acquisition, in pertinent part:

> The acquisition also nicely leverages Organon's existing therapeutic
> expertise in dermatology. Our existing dermatology portfolio of 7
> products outside the U.S. delivered $240 million of revenues in 2023.
> The addition of VTAMA allows us to create a dermatology presence in
> the U.S., where we have a very experienced and scaled access team at
> the local state and national levels. We expect to be in a position to
> launch the AD indication immediately after approval, focused on
> expanding access, ultimately improving VTAMA's gross-to-net over
> time. We'll also have the potential to launch internationally down the
> road. Overall, we believe we are the best owner of VTAMA with solid
> growth prospects and healthy margins. We believe it will contribute
> solidly to the financial profile of Organon.
>
> *            *            *
>
> In addition to reporting our results today, we are able to share more
> about our Dermavant acquisition and its key assets, VTAMA, which
> we closed on Monday. VTAMA is a nonsteroidal topical cream already
> approved for the treatment of plaque psoriasis in adult patients.
> VTAMA also has a Q4 PDUFA date for a potential new indication, the
> topical treatment of atopic dermatitis in adults and pediatric patients 2
> years of age and older. The near-term potential for the proposed atopic
> dermatitis indication is the much more attractive opportunity for us for
> 2 main reasons. First, the size of the market. There are 3x as many
> patients suffering from atopic dermatitis as compared to psoriasis. And
> second, for those millions of patients, if approved, we believe VTAMA
> can address an existing gap in the standard of care for atopic dermatitis.

There is a significant unmet need in atopic dermatitis for the treatment option with the efficacy of a biologic and with the safety and tolerability profile of a topical treatment that can be used long term. This point is especially important as nearly half of all atopic dermatitis sufferers are children. Because of this unique clinical profile, we believe VTAMA will be much better positioned in the atopic dermatitis market than it ever was in the psoriasis market. In fact, in our view, the opportunity for VTAMA in AD versus psoriasis is night and day.

20.    Also during the earnings call, CFO Walsh provided insight into the

impact the Dermavant acquisition will have on Organon, in relevant part:

We provide a closer look at our cash flow year-to-date. ***And despite some minor headwinds from the Dermavant acquisition, as Kevin mentioned, we're well on track to deliver approximately $1 billion of free cash flow before onetime charges.*** Year-to-date, those onetime spin-related costs were $137 million. Our global ERP implementation is now behind us, and that was the largest driver of these onetime costs. Our view into the fourth quarter is that costs in this category will be minimal. So we expect to finish the year at approximately $150 million which is better than the $200 million of onetime spin-related costs that we were originally forecasting for 2024. Next year, in 2025, we would expect onetime spin-related costs to be de minimis.

In the $129 million of other onetime costs, here, we capture head count restructuring initiatives and manufacturing network optimization. The cash outlay for these network optimization costs have amounted to $44 million year-to-date 2024. They are distinct from the spin-related costs and that they're associated with actions to separate our manufacturing and supply chain activities away from Merck, which will ultimately drive cost efficiencies and eventual gross margin improvement. We expect this bucket to total about $75 million this year.

Turning to Slide 12. ***We ended the quarter at 4.0x on our net leverage ratio, which was a 0.25 turn better than this time last year and also slightly better than where we were at year-end, 4.1x. Year-to-date, we have had stronger EBITDA generation, which has resulted in a leverage ratio at September 30, 2024, that is more favorable than our expectations at the start of the year. That said, it will take us several***

8

***quarters to digest the Dermavant acquisition before leverage can
return to the 4.0x net leverage ratio that we've achieved as of this
quarter end.***

[Emphasis added].

<u>February 13, 2025</u>

21.     On February 13, 2025, Organon published a press release detailing

fourth quarter and full year 2024 results. As part of the associated earnings call, CEO

Kevin Ali stated in pertinent part:

> Three, consistent deployment of capital. We're committed to our
> regular dividend as our #1 capital allocation priority.

22.     Also during the earnings call, CFO Matthew Walsh stated, in relevant

part:

> As we think about capital allocation, the priority, as Kevin mentioned,
> is our dividend. And in the past 2 years, the highest and best use of the
> remaining cash flow has been opportunistic business development. In
> 2024, we made upfront and milestone payments totaling about $350
> million. In 2025, we expect to pay a little over $200 million in
> commercial milestones. We've already paid about $130 million
> between Vtama's AD approval and Emgality commercial milestones.
> An additional $30 million to $70 million would be due if milestones for
> Henlius and SJ02 are met. The achievement of these milestones means
> that we're realizing value for business development already signed and
> validates the path to low to mid-single-digit revenue growth post 2025
> that we've been saying Organon should be able to deliver.

23.     The above statements in Paragraphs 19 to 22 were false and/or

materially misleading. Defendants concealed material information pertaining to

Organon's capital allocation priorities, particularly the future of the quarterly

9

dividend payout. In truth, Organon's optimistic reports of the dividend payout as the Company's "number one priority," were offset by Organon's newly implemented debt reduction strategy, thus, leading to a drastic decrease – over 70% – of the quarterly dividend. The Defendants' lofty statements that capital allocation through deployment of a quarterly dividend was a priority fell short of the truth; in reality, Organon planned to prioritize debt reduction following the Company's acquisition of Dermavant.

### The Truth Emerges during Organon's First Quarter Fiscal 2025 Earnings Report

#### May 1, 2025

24.    On May 1, 2025, Organon published a press release detailing first quarter 2025 results and announced that management reset the Company's dividend payout, from $0.28 to $0.02. As part of the press release, CEO Ali issued a statement regarding the dividend, in pertinent part:

> We have reset our capital allocation priorities to accelerate progress towards deleveraging, enabling a path to achieve a net leverage ratio of below 4.0x by year-end. Over the last year, we have established a leaner, more fit-for-purpose cost structure while increasing revenue contribution from our core growth drivers. By deleveraging more rapidly, we will continue to strengthen the future prospects of the company. Over time, this will position us to execute more of the compelling business development we've done to date, bringing in additional growth drivers to our portfolio, while maintaining lower leverage. With key growth drivers, *Nexplanon* and *Vtama*, on track to achieve their revenue objectives for the year, we are affirming our full

year revenue and Adjusted EBITDA margin guidance, as well as our target of generating over $900 million of free cash flow before one-time costs.

25.    Organon held an earnings call shortly after posting the results. During

the call, Defendants issued statements regarding the dividend shift. CEO Ali stated,

in relevant part:

> Today, we also announced that we have reset our dividend payout, and we'll redirect those funds to debt reduction. With a reduced dividend payout, the company can redeploy almost $200 million in prospective dividend payments over the remainder of 2025 that will enable a path to achieve a net leverage ratio below 4 by year-end.

26.    Also during the earnings call, CFO Walsh stated, in pertinent part:

> The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issues, and so returning capital to shareholders is right now, less of a priority. It's one of the reasons why we made the move that we did with the dividend announcement today.

27.    During the question-and-answer segment of the earnings call,

Defendants answered questions from analysts relating to the dividend reset, in

relevant part:

> <Q: Ethan Harris Brown - JPMorgan Chase – Analyst> This is Ethan on for Chris Schott. On the first question, I just wanted to ask about capital allocation more broadly in your framework going forward. And maybe more specifically, how share repo might fit into that equation relative to debt paydown and business development. And then my second question is just on the potential impact of tariffs. I know you provided some commentary on 2025. But any general color on your ability to navigate this dynamic looking past 2025, although details are lacking, maybe just frame how you're thinking about that impact.

<A: Kevin Ali - CEO & Director> Yes, Ethan, I think Matt and I will ping pong on addressing these topics. So I'll keep the tariff issue aside for Matt to deal with. But on capital allocation, really briefly, right? Look, we're doing this. I want to be clear. We're doing this from a position in terms of what we've done with the dividend today, what we announced from a position of strength. Over the last few years, we have, for example, reestablished NEXPLANON, our key product where we're going to surpass $1 billion this year. We have stabilized the established brands business.

We have essentially regrowing our fertility business. We have also successfully launched JADA and Hadlima and Emgality and now VTAMA and TOFIDENCE. And so we're very comfortable with the fact that going forward, some of the headwinds we faced this year with the loss of exclusivity of our second largest product out of that will be behind us. And essentially going forward, we have opportunities really to accelerate our top line and bottom line growth. And so for that -- and we've done 3 restructurings in the last 1.5 years. So we're a much more leaner fit-for-purpose organization. This is really done in order to be able to set us up so that in the future, we can do more business development deals like the VTAMA and Topaz deal that we just did recently in order to be able to continue to grow, continue to grow for the long term. And so I believe this is a position of -- right? And when it comes now to your second question around tariffs, I'll hand that over to Matt in terms of -- in regards to the fact of what we see today is not something that we feel very concerned about, but...

*          *          *

<A: Matthew M. Walsh - Executive VP & CFO> Sure. So share buybacks have been a lower priority for us in our roster of capital allocation priorities. The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issues, and so returning capital to shareholders is right now, less of a priority. It's one of the reasons why we made the move that we did with the dividend announcement today.

So -- and especially as long as our leverage is above 4x I believe we'll create more value and better positioning and overall strength for the future by rightsizing our leverage versus buying back shares.

12

*     *     *

<Q: Umer Raffat - Evercore ISI Institutional Equities –Analyst> I mean, look, I feel like Dermavant deal was a surprise, but today is a bigger surprise, and there's a lot of market sentiment that they can't have confidence in consistency and decision-making process at Organon right now. So specifically, last call, you guys said you're committed to regular dividend as the #1 capital allocation priority. I think you just now said return on capital is a lower priority. And I guess the question is really for all the investors on the line. What is the priority? And how can we be sure that this will be the priority going forward because there appears to be a lot of things just moving around constantly.

<A: Kevin Ali> Umer, thanks for the question. And if you notice things are going on in the outside macro environment is changing. It's quite volatile out there. Clearly, investment community is not clearly focused on the dividend for us as much as it is on leverage. I hear it. in almost every discussion that I have with investors that they're very concerned about where we are in terms of leverage in these very volatile times. It's really a risk-off type of analysis.

So for us, we are very committed to that. But when we saw the type of volatility happening, we saw the timing, we're on the verge of really having, I think, a really great year in 2026 and the second half of this year, I think we're in a much better position to say, look, we know that we can delever very quickly, and as we delever and as we have a situation where we give us here is more of an opportunity, to bring in assets like VTAMA. And I will tell you that right now, if you just look at the NRx and TRx of VTAMA, it's clearly positive signaling to the fact that we made the right decision, and hopefully, we'll be able to have a discussion at the end of the year where you see that we delivered what we said we were going to deliver with the product.

And ultimately, then you see that the run rate of where we're going with this product and the type of label we're developing was a good use of capital. And I think there's a better use of capital on bringing in more assets in that space. And so the combination of what's happening externally, coupled with where investors essentially are kind of telling us that they're very focused on delevering much more so than anything else kind of brought us to the fact. And the initial encouraging results

we're really having with VTAMA and the continued strength of our core products like NEXPLANON tells us that there's a better use of that capital in terms of being able to go forward and use it to be able to not only delever but bring in growth aspects for the company.

28.     The aforementioned press releases and statements made by the Individual Defendants contradicted their earlier statements, including those made during the October 31, 2024, and February 13, 2025, earnings calls. During those calls, the Defendants assured investors that the regular quarterly dividend was a number one priority and that the Company was committed to its capital allocation strategy through the aforementioned dividend. Further, Defendants continually highlighted the Company's prioritization of capital allocation by means of the quarterly dividends, while touting Organon's acquisition of Dermavant and its key asset, VTAMA, minimizing any risks associated with the Company's capital allocation strategy.

29.     Investors and analysts again reacted promptly to Organon's revelations. The price of Organon's common stock declined dramatically. From a closing market price of $12.93 per share on April 30, 2025, Organon's stock price fell to $9.45 per share on May 1, 2025, a decline of more than 27% in the span of just a single day.

30.     A number of well-known analysts who had been following Organon lowered their price targets in response to Organon's disclosures. For example, Evercore ISI analyst downgraded Organon in response to the 70% cut in the Company's set dividend, stating, in relevant part:

Here's what Organon did today: cut their dividend massively (dropped from $0.28/share to $0.08/share – i.e., 70%+ cut). This hits especially hard because their base biz is actually doing reasonably well … and even the new launch (Vtama – where I am very nervous on peak sales) came in quite good at $24M this Q with atopic derm launch (i.e., almost ~$100M run rate … vs ~$70-80M run rate during Roivant ownership).

31.     Similarly, CFRA, while reiterating its "sell" view on shares, reduced its price target for Organon to $8 from $10.

32.     The fact that these analysts, and others, discussed Organon's massive dividend cut and sudden reprioritization from capital allocation to deleveraging and debt reduction suggests the public placed significant weight on Organon's prior statements regarding the Company's regular dividend as a number one priority. The frequent, in-depth discussion of Organon's dividend declaration confirms that Defendants' statements during the Class Period were material.

### Loss Causation and Economic Loss

33.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Organon's common stock and operated as a fraud or deceit on Class Period purchasers of Organon's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Organon's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of

Organon's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

34.    Organon's stock price fell in response to the corrective event on May 1, 2025, as alleged supra. On May 1, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Organon's capital allocation strategy and its quarterly dividend.

35.    In particular, on May 1, 2025, Organon announced that it would be cutting the regular quarterly dividend by 70% and that the Company would be shifting focus from capital allocation to debt reduction.

### Presumption of Reliance; Fraud-On-The-Market

36.    At all relevant times, the market for Organon's common stock was an efficient market for the following reasons, among others:

(a)    Organon's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Organon communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Organon was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Organon was reflected in and incorporated into the Company's stock price during the Class Period.

37.     As a result of the foregoing, the market for Organon's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Organon's stock price. Under these circumstances, all purchasers of Organon's common stock during the Class Period suffered similar injury through their purchase of Organon's common stock at artificially inflated prices, and a presumption of reliance applies.

38.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

39.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

40.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

41.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Organon who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by

Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Organon's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Organon's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed

Class. Record owners and other members of the Class may be identified from records maintained by Organon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. April 25, 2025, there were approximately 260 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organon;

(c)      whether the Individual Defendants caused Organon to issue false and misleading financial statements during the Class Period;

(d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of Organon's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Organon common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Organon's securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Organon's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

52.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Organon's internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Organon's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Organon's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Organon's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

55.     During the Class Period, Organon's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Organon's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Organon's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Organon's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

58.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Organon's misstatements.

60.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Organon which had become materially false or misleading.

61.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Organon disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout

the Class Period, the Individual Defendants exercised their power and authority to cause Organon to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Organon's common stock.

62.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Organon to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.    By reason of the above conduct, the Individual Defendants and/or Organon are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: May 23, 2025                                         Respectfully submitted,

                                                                            **LEVI & KORSINSKY, LLP**


                                                                            */s/ Adam M. Apton*
                                                                            Adam M. Apton
                                                                            33 Whitehall Street, 17th Floor
                                                                            New York, New York 10004
                                                                            Tel.: (212) 363-7500
                                                                            Fax: (212) 363-7171
                                                                            Email: aapton@zlk.com

                                                                            *Attorneys for Plaintiff*

28
